UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

08 - 21158  CR - COOKE

MAGISTRATE JUDGE
BANDSTRA

CASE NO:

18 U.S.C. § 1349
18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1956(h)
18 U.S.C. § 2
18 U.S.C. § 981(a)(1)(C)
18 U.S.C. § 982(a)(1)
28 U.S.C. § 2461(c)

UNITED STATES OF AMERICA

v.

JOEL STEINGER,
    a/k/a "Joel Steiner,"
STEVEN STEINER,
    a/k/a "Steven Steinger,"
MICHAEL McNERNEY, and
ANTHONY LIVOTI, JR.,



FILED by _____ D.C.

DEC 2 3 2008

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. - MIAMI

                          **Defendants.** /

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At various times relevant to this Indictment:

## Mutual Benefits Corp.

1.    Mutual Benefits Corp. ("MBC") was a business with principal offices in the Southern

District of Florida, initially at 2881 E. Oakland Park Boulevard, Suite 200, Fort Lauderdale, Florida,

and subsequently at 200 E. Broward Boulevard, 10th Floor, Fort Lauderdale, Florida. MBC was a Florida corporation formed on or about October 18, 1994.

2.      MBC sold investments called viatical and life settlements to the general public. MBC began as a small company, and ultimately expanded into a billion dollar company that sold investments to thousands of investors located throughout the United States and worldwide. MBC purportedly sold investments that were "safe and sound," that had a "high rate of return," and had "low risk" and "security." MBC represented to investors that their rights were "protected" and that their investment interest was "irrevocable" and could not "change." The company said it conducted business with "honesty" and "integrity" and encouraged the public to purchase MBC investments for: "IRA's," "Saving for College," "Saving for Retirement," "Pension Rollovers," and "Estate Planning."

3.      A viatical or life settlement is an investment in which an elderly or terminally ill person sells his life insurance policy to investors for a cash payment, which is a percentage of the policy's face value or death benefit. The "face value" or "death benefit" is the amount of money paid by the insurance company when the insured dies. For example, a life insurance policy with a $1 million face value might be purchased at auction as an investment for $400,000, which is 40% of the policy's death benefit.

4.      Once an insurance policy is sold by the insured, he is no longer responsible for paying its premiums. The viatical and life settlement company purchasing the policy thereafter assumes responsibility for arranging the payment of any premiums.

5.      Viatical and life settlements are investments that pay when the insured individual dies. A policy is said to have "matured" when the insured individual dies and the insurance

2

company is required to pay the death benefit to the designated parties, that is, "beneficiaries." All premiums due prior to the death of the insured must be paid, in full and on a timely basis, to prevent additional cost or lapse. If an insurance policy lapses for any reason, such as failure to pay premiums, the policy's death benefit and any investment dependent on that benefit may be lost.

6.      MBC, as a viatical and life settlement company, sold interests in insurance policies to investors. When an investor purchases an interest in an insurance policy, he is buying the right to receive a portion of the death benefit when the insured dies. MBC typically combined investors together on a single policy, such that each investor was assigned a percentage or fraction of the death benefit. This is known as "fractionalizing" a policy. The sale of fractional interests allowed investors to invest smaller amounts of money, because each investor did not have to pay for the whole policy.

7.      Investors who purchase viatical and life settlements only realize a profit if the total amount invested in the policy, including the purchase price and any additional premium costs, is less than the amount of the death benefit that the investor receives when the insured dies. A viatical or life settlement is not profitable if the expenses of acquiring and maintaining the policy (including the amount of premiums that are paid) is more than the amount of the death benefit paid when the insured dies. Typically, the longer an insured lives the more expensive it is to maintain a viatical or life settlement.

8.      The period of time that the insured is predicted to live is called the "life expectancy." In the purchase and sale of viatical and life settlements, the assessment of an insured's life expectancy is used to determine, among other things: (i) how much money needs to be set aside to pay future premiums; (ii) when the investor can expect to receive a payout on his or her investment;

and (iii) the amount of profit the investor can expect to receive.

9.       From in or around October 1994 through in or around early 2001, almost all of the policies MBC sold to investors were policies where the insured was represented to be afflicted with Acquired Immunodeficiency Deficiency Syndrome ("AIDS"). According to MBC, the insureds on these policies had shortened life expectancies because they were afflicted with AIDS.

10.      Around mid-2001, MBC attempted to change its viatical and life settlement program to focus on selling policies insuring elderly individuals and people suffering from illnesses other than AIDS, like cancer. Nonetheless, MBC continued to sell interests in a number of AIDS policies through 2004.

11.      MBC set aside a portion of the money it received from investors to pay premiums on MBC insurance policies. This money was placed in an escrow account to be held and managed by a purportedly independent "premium trustee."

### Viatical Services, Inc.

12.      Viatical Services, Inc. ("VSI"), supposedly an independent company,  was formed in or about March 1996 to perform "post-investment services" for investors who purchased MBC investments. Specifically, VSI monitored insurance policies sold by MBC to identify when premium payments were due, instructed MBC's "premium trustee" to pay premiums on each policy as they became due, tracked the status of the insureds covered by the policies in MBC's program, and collected and processed death benefits.

13.      VSI was a Florida corporation with principal offices located in the Southern District of Florida, initially at 2817 E. Oakland Park Boulevard, Suite 301, Fort Lauderdale, Florida, and later at 2755 E. Oakland Park Boulevard, Suite 230, Fort Lauderdale, Florida.

4

### The Defendants

14.     From in or around October 1994 through in or around May 2004, defendant **JOEL STEINGER, a/k/a "Joel Steiner,"** one of the founders of MBC, was MBC's principal executive, managing all important business activities. His approval was required for all major decisions affecting MBC, including decisions on legal issues, policy acquisitions and sales, and premium accounts. **JOEL STEINGER** also had an active role in MBC's "policy acquisition department," where he bid on insurance policies and assigned individual investors to those policies. Despite **JOEL STEINGER's** role as principal executive, his true role in the company's operations was not disclosed to investors or regulators. Instead, he was represented to be a general consultant who provided various services to MBC.

15.     Defendant **STEVEN STEINER, a/k/a "Steven Steinger,"** one of the founders of MBC, worked with MBC's sales staff from in or around October 1994 through in or around May 2004, and led MBC's public relations efforts. **STEVEN STEINER** regularly met with and spoke to investors, encouraging them to purchase the viatical and life settlements sold by MBC.

16.     **JOEL STEINGER, STEVEN STEINER,** Conspirator L.S., and Peter Lombardi, the four founders of MBC, agreed that they would share MBC profits equally.

17.     Defendant **MICHAEL McNERNEY**, an attorney licensed in the State of Florida, was a partner at a local law firm (hereinafter referred to as "The Firm"). **McNERNEY** had a long standing relationship with **JOEL STEINGER**, having represented him in connection with a civil litigation matter prior to the formation of MBC. By the end of 1996, MBC was a significant client of The Firm, and **McNERNEY** was the primary partner handling and supervising almost all MBC matters.

5

18.     **MICHAEL McNERNEY** and his law firm performed a variety of duties for MBC, in addition to providing legal services.  From in or around 1996 through as late as June 2002, The Firm was the initial escrow agent for MBC, accepting MBC investor checks, which were made payable to The Firm, and depositing the checks in a firm-controlled bank account, known as the "Initial Escrow Account."  Additionally, The Firm acted as MBC's closing agent on investment transactions.  As a result, **McNERNEY,** and others under his supervision and at his direction, reviewed documents associated with the acquisition, transfer, and sale of insurance policies, and directed the distribution of investor funds.

19.     **MICHAEL McNERNEY** and The Firm also participated in the marketing of MBC's viatical and life settlements through regularly hosted investor tours.  On these tours, **McNERNEY** and others under his supervision and at his direction explained and promoted MBC's investments. The Firm was included as a reference in marketing and promotional materials distributed to MBC sales agents across the country.

20.     **MICHAEL McNERNEY** also handled traditional legal services for MBC, including, but not limited to, drafting and filing regulatory documents on behalf of the company, and representing MBC and its principals in numerous lawsuits and regulatory matters brought by investors who alleged that they had been defrauded by MBC.

21.     Defendant **ANTHONY LIVOTI, JR.,** a solo practicing attorney licensed in the State of Florida, acted as a purportedly independent "premium trustee" for MBC investors from as early as 1996 through in or around May 2004. As premium trustee, **LIVOTI** was purportedly responsible for safeguarding investor monies set aside to pay policy premiums and for actually making premium payments on MBC policies.  **LIVOTI** was instructed by VSI as to when payments on premiums

6

should be made. Additionally, **LIVOTI** was designated as the "owner" of many of the insurance policies that MBC purchased for investors. As a result, **LIVOTI** regularly signed insurance company documents that supposedly transferred ownership of the policies from the individual sellers, called "insureds," to **LIVOTI** or his law firm.

### Other MBC Employees

22.     From in or around October 1994 through in or around 1997, Conspirator L.S., a founder of MBC, held the nominal title of President of MBC. Conspirator L.S.'s actual responsibilities involved the supervision of MBC's sales force, including a team of "marketing directors" who recruited and managed an international network of outside sales agents. In addition, Conspirator L.S. played an active role in MBC's management by participating in important business decisions, including those related to legal and financial matters impacting the company. Conspirator L.S. died in 2008.

23.     Peter Lombardi was also a founder of MBC, and he was listed as MBC's sole shareholder. From in or around 1997 through on or about May 5, 2004, Peter Lombardi was the nominal "President" of MBC, although his duties were mostly limited to the accounting department. Throughout this time period, the true principal executive was **JOEL STEINGER.**

24.     Carol Traina was an employee at MBC from in or around 1995 through in or around May 2004. During that time, she held various positions at MBC, ultimately attaining the position of Office Manager. As Office Manager, Carol Traina's responsibilities included personnel management, assisting in the supervision of MBC's marketing directors and outside sales agents, and responding to investor complaints.

25.     Bari Wiggins was an employee at MBC from in or around 1995 through in or around

May 2004. During that time, she held various positions at MBC, including Director of Policy Services. Bari Wiggins' daily activities included assisting **JOEL STEINGER** with the evaluation and acquisition of insurance policies from viatical brokers who sold insurance policies to MBC.

26.     From in or around 1995 to in or around May 2001, Clark Mitchell was a licensed medical doctor hired by MBC to provide life expectancy determinations for policies purchased by MBC.   Clark Mitchell acted under the direction of **JOEL STEINGER**, and adopted life expectancies that **JOEL STEINGER** dictated to him.

27.     Raquel Kohler was an employee at MBC from in or around May 2001 through in or around May 2004. During much of that time, Raquel Kohler held the title of Chief Financial Officer of MBC. As Chief Financial Officer, Raquel Kohler reconciled MBC's bank accounts, wired funds in and out of MBC's accounts, reviewed documents in connection with financial audits, and provided information to state regulators.

28.     From as early as 1995 through in or around May 2004, Ameer Khan was an employee at VSI, the company that performed post-investment services for MBC investors. Ameer Khan held the title of President and sole shareholder of VSI. Despite his purported position as President and sole shareholder, Ameer Khan reported to, and took direction from, **JOEL STEINGER** with respect to all major decisions at VSI.

### Other Relevant Entities

29.     MBC's four founding principals, used a number of shell corporations to receive money from MBC, as set forth below:

      a.     **JOEL STEINGER** received money through accounts in the name of Kensington Management Inc., Bull Max Inc., Prime International, Inc., and

Policy Consulting, Inc.;

b.    Conspirator L.S. received money through accounts in the name of Rainy Consulting Corp., Twin Groves, Inc., and Preferred Management Group.;

c.    **STEVEN STEINER** received money through accounts in the name of Camden Consulting, Inc. and SKS Consulting, Inc.; and

d.    Peter Lombardi received money through an account in the name of P.J.L. Consulting, Inc.

### Ponzi Scheme

30.    A "Ponzi" scheme is a fraudulent investment scheme. An account used as part of a "Ponzi" scheme operates at a loss, but it nevertheless can be sustained by obtaining new investors, and using the new investors' money to pay financial obligations related to earlier investors. The effect of a "Ponzi" scheme is to put the account further into debt by increasing the responsibility to pay more financial obligations, as more investors are added to the account.

### COUNT 1
### Conspiracy to Commit Mail and Wire Fraud
### (18 U.S.C. § 1349)

1.    Paragraphs 1 through 30 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.    From as early as October 1994 through at least May 2004, in the Southern District

of Florida, and elsewhere, the defendants,

**JOEL STEINGER,**
**a/k/a "Joel Steiner,"**
**STEVEN STEINER,**
**a/k/a "Steven Steinger,"**
**MICHAEL McNERNEY,**
**and**
**ANTHONY LIVOTI, JR.,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with each other, with Peter Lombardi, Carol Traina, Raquel Kohler, Bari Wiggins, Clark Mitchell, Stephen Ziegler, Ameer Khan, and others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

(a) to knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and causing to be delivered certain mail matter by the United States Postal Service and any private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1341;

(b) to knowingly and with intent to defraud devise and intend a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmitting and causing to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme and artifice to defraud, in violation of Title 18, United States Code, Section 1343.

10

## PURPOSE OF THE CONSPIRACY

3.      The purpose of the conspiracy was for the defendants and their co-conspirators to unjustly enrich themselves by misappropriating monies from investors for their personal use and benefit by means of materially false and fraudulent representations and concealment of material facts concerning, among other things, the safety and security of MBC investments and the expected profits of these investments.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Raquel Kohler, Bari Wiggins, Clark Mitchell, Stephen Ziegler, Ameer Khan, their co-conspirators, and others, fraudulently offered and sold MBC investments to the general public, raising more than $1.25 billion from more than 30,000 investors worldwide, resulting in investor losses of approximately $837 million.

5.      **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Stephen Ziegler, their co-conspirators, and others, directly and indirectly, solicited investors through an international network of thousands of sales agents and over 10 marketing directors, all of whom, directly or indirectly, reported to MBC's principals.  Investors were solicited through MBC investment seminars held around the nation, an Internet website, advertisements, mailings, and by telephone.

6.      **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL**

11

McNERNEY, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Stephen Ziegler, their co-conspirators, and others routinely conducted investor tours of MBC and The Firm, through which investors were led to believe that MBC was a reputable and legitimate operation. In many instances, investors met personally with **MICHAEL McNERNEY,** who made assurances concerning the soundness of the MBC investment and the company itself.

7.     To induce individuals to purchase MBC investments, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Stephen Ziegler, their co-conspirators, and others made, and caused others to make numerous false and fraudulent representations concerning such matters as the management of MBC and its related entities, the safety and reliability of the MBC investment, historical returns on the investments, the life expectancy of individuals insured by the life insurance policies being sold, and the sufficiency of the funds set aside to make premium payments on the investors' policies.

### The True Management of MBC and Its Related Entities was Concealed

8.     **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Raquel Kohler, Bari Wiggins, Ameer Khan, their co-conspirators, and others concealed from investors the fact that MBC's controlling principal was **JOEL STEINGER**. His principal role at MBC was hidden from the public during investor solicitations and public documents, such as corporate and regulatory filings. Many of these documents were prepared by **MICHAEL McNERNEY** and others at his direction at The Firm.

9.     **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL**

12

McNERNEY, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Raquel Kohler, Bari Wiggins, Stephen Ziegler, Ameer Khan, their co-conspirators, and others referred to **JOEL STEINGER** as an outside consultant who worked for a company named Kensington Management, Inc. In reality, Kensington Management, Inc. was a shell company with no offices or employees, formed solely for **JOEL STEINGER** to receive his share of the fraudulent proceeds from MBC.

10.     Despite **JOEL STEINGER's** true role as the ultimate authority at MBC, Conspirator L.S. was originally listed as MBC's President until in or around 1997, when Florida state regulators learned that Conspirator L.S. had a regulatory history for defrauding investors. Thereafter, Peter Lombardi was given the title "President" of MBC. While Peter Lombardi represented to be the sole shareholder, he had few responsibilities other than handling internal accounting at MBC. **JOEL STEINGER** remained the primary controlling principal throughout MBC's operation.

11.     **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER, MICHAEL McNERNEY, ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Raquel Kohler, Bari Wiggins, Stephen Ziegler, Ameer Khan, their co-conspirators, and others, concealed **JOEL STEINGER's** primary executive role at of MBC, in part, to avoid being compelled to disclose to investors and regulators that a principal of MBC had the following criminal and regulatory disciplinary history:

        a.      that on or about May 18, 1978, **JOEL STEINGER** was enjoined by a United States District Court in the case of *Commodity Futures Trading Commission v. Joel Steiner, et al.*, Case No. 77-CIV-2678 (EW) (Southern District of New York) from, among other things, further violating the anti-fraud provisions of the Commodity Exchange Act, as amended and the regulations promulgated thereunder;

13

b.      that on or about January 28, 1981, **JOEL STEINGER** was criminally convicted in the case of *United States v. Joel Steiner, et al.*, Case No. 79-57-CR-EPS (Southern District of Florida) of, among other things, engaging in a mail and wire fraud scheme and artifice devised to enrich **JOEL STEINGER** and others "by fraudulently re-selling to the public, at vastly increased prices, commodity options which they simply purchased at market rates from a brokerage firm in New York, New York," in violation of Title 18, United States Code, Sections 1341, 1343 and 2;

c.      that on or about September 13, 1989, **JOEL STEINGER** and Conspirator L.S. were permanently barred from the commodities industry in the administrative action *In the Matter of Joel Steiner, et al.*, CFTC Docket No. 89-21;

d.      that on or about October 11, 1989, **JOEL STEINGER** and Conspirator L.S. were enjoined by a United States District Court in the case of *Commodity Futures Trading Commission v. Joel Steinger, et al.*, Case No. 88-6958-CIV-Paine (Southern District of Florida) from, among other things, further violating the anti-fraud provisions of the Commodity Exchange Act, as amended and the regulations promulgated thereunder; and

e.      that on or about May 6, 1998, **JOEL STEINGER** and Conspirator L.S. were enjoined by a United States District Court in the case of *Securities and Exchange Commission v. Joel Steinger, et al.*, Case No. 98-6442-MIDDLEBROOKS (Southern District of Florida) from, among other things, further violating the anti-fraud provisions of the federal securities laws, and they were ordered to repay approximately $850,000 to MBC investors who were victimized by their scheme and

14

artifice.

12.     In addition to concealing **JOEL STEINGER's** controlling role at MBC and his criminal and regulatory disciplinary history, the defendants, their co-conspirators, and others, concealed numerous regulatory actions against MBC, its principals, and its sales agents.   For example Alabama, Alaska, Indiana, Pennsylvania and Vermont, each issued cease-and-desist orders against MBC and its principals for securities fraud and registration violations.   In addition to these actions, Kansas issued a cease-and-desist order against several MBC sales agents who sold MBC's viatical and life settlements in that state. Despite the fact that many of theses regulatory actions were based on complaints alleging that MBC had defrauded investors, the defendants, their co-conspirators, and others, concealed these actions from prospective investors.

13.     **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY, ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Ameer Khan, Steven Ziegler, their co-conspirators, and others, directly and indirectly, made false and misleading representations to investors to make them believe that MBC's viatical and life settlement program involved several independently operated businesses, including medical offices and professionals, servicing companies, viatical brokerage companies, and law firms, and that the purported independence of these businesses offered MBC's investors additional safety.

14.     The defendants and their co-conspirators falsely assured MBC investors that premium funds were being managed by an independent trustee, **ANTHONY LIVOTI, JR.** Investors were told that **LIVOTI** had an independent "fiduciary" responsibility to MBC investors, and a legal obligation to use reasonable care when dealing with the investors' premium monies. In truth and fact, **LIVOTI** was controlled by **JOEL STEINGER** and managed the premium money

15

at **JOEL STEINGER's** direction.

15.    **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** Peter Lombardi, Carol Traina, Ameer Khan, Steven Ziegler, their co-conspirators, and others, directly and indirectly, falsely represented to investors that VSI was an independently operated company hired by MBC to monitor post-closing matters, including the timely payment of premiums.

16.    **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** Ameer Khan, their co-conspirators, and others, filed corporate documents that listed Ameer Khan, a VSI employee, as the President and owner of the company. In reality, **JOEL STEINGER** gave Ameer Khan his ownership of VSI, and Ameer Khan ran VSI at **JOEL STEINGER's** direction. Concerns raised by Ameer Khan regarding the sufficiency of the premium reserves were ignored by **JOEL STEINGER.**

### Fraud Involving Life Expectancies

17.    **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** their co-conspirators, and others, through MBC's sales force, falsely promised investors a "fixed return" on their investment, depending on the life expectancy that MBC predicted for the insured on the particular policy. The rates of return promised

to investors were as follows:

| Life Expectancy | Fixed Return |
|---|---|
| 12 Months | 12% |
| 18 Months | 21% |
| 24 Months | 28% |
| 36 Months | 42% |
| 48 Months | 50% |
| 60 Months | 60% |
| 72 Months | 72% |

18.     MBC's sales agents and marketing directors, acting under the direct or indirect supervision and direction of **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, Peter Lombardi, Carol Traina, their co-conspirators, and others, falsely represented to investors that MBC had a strong track record of accurately predicting life expectancies. Investors were falsely told that 80% of all MBC policies matured at or before the predicted life expectancies. Investors were also falsely told that only 5% of MBC policies went beyond the predicted life expectancies. In truth and in fact, MBC failed to accurately predict the life expectancies on most of the policies it sold throughout the 10 years that MBC operated.

19.     To convince investors that life expectancy predictions were reliable, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, Peter Lombardi, Carol Traina, their co-conspirators, and others, falsely assured investors that life expectancies on MBC policies were determined by an independent medical doctor who evaluated the health of insured. Doctors hired by MBC to perform these supposed life expectancy evaluations would sign letters and affidavits mailed to investors which falsely stated that the doctor made an "independent" assessment of the insured's life expectancy.

20.     **JOEL STEINGER** pressured doctors to assign particular life expectancy numbers for insurance policies to be sold to investors. One such doctor, Clark Mitchell, signed letters and

17

affidavits adopting false life expectancies actually dictated by **JOEL STEINGER** on approximately 6,000 life insurance policies sold by MBC. Clark Mitchell's false life expectancy evaluations were sent to more than 18,000 MBC investors.

21.     For each year that MBC operated, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, Peter Lombardi, Carol Traina, their co-conspirators, and others, concealed the fact that the vast majority of life insurance policies acquired by MBC never matured, and that the overwhelming majority of MBC's investors never made any profit on their investment, but lost the money they originally invested with MBC.

### Ponzi Scheme of Premium Funds

22.     As part of their investor solicitations, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER, MICHAEL McNERNEY, ANTHONY LIVOTI, JR.,** their co-conspirators, and others, assured potential investors that MBC set aside enough money to pay premiums due during the projected life expectancy of the insured. The defendants, their co-conspirators, and others, further assured investors that there was almost no possibility the investors would personally have to pay the premium obligations on MBC policies. In truth and in fact, given the fabricated life expectancies, the associated failure of the policies to mature, and an inventory of policies with increasing premiums, the defendants failed to set aside sufficient funds to pay future premium obligations.

23.     Despite the severely inadequate premium reserves, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER, MICHAEL McNERNEY, ANTHONY LIVOTI, JR.,** their co-conspirators, and others, concealed from existing and prospective investors the grave risk that the premium money would be depleted, that MBC policies could lapse, and that any investment in them

18

could be worthless.

24.     To conceal the problem of deficient premium reserves, the defendants and their co-conspirators pooled the premium money together in one or more bank accounts, purportedly controlled by **ANTHONY LIVOTI, JR.**, as the premium trustee.  By pooling all of the money together, MBC paid  premiums on older policies by using premium money set aside for newer policies, creating a "Ponzi scheme."  This depleted funds set aside for the newer policies, placing the newer policies at risk, as well.

25.     As more policies went beyond life expectancy, the defendants and their co-conspirators needed to sell more and more new policies to fund the premium pool and to prevent the older policies from lapsing.

### Acquisition of Worthless Gift Policies

26.     **JOEL  STEINGER,** Conspirator L.S., **STEVEN  STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** their co-conspirators, and others, directly and indirectly, misrepresented to investors the safety and security of MBC investments by concealing from investors the fact that MBC acquired a number of life insurance policies by fraud.  The defendants and their co-conspirators also failed to inform investors that some of the life insurance policies that MBC purchased had provisions restricting the transfer of policies to"gift assignments," such that the insured could only transfer the policy as a gift and could not sell the policy for value.

27.     In order to circumvent this restriction, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, **ANTHONY LIVOTI, JR.,** their co-conspirators, and others, engaged in a number of fraudulent practices that created the false impression that these policies were transferred as "gifts" to **ANTHONY LIVOTI, JR.**  In reality, these policies were

purchased by MBC and then sold to MBC investors. **LIVOTI** signed documents falsely stating that he had received these policies as a "gift" and as a "friend" of the insured. Moreover, when insurance companies called to question the transfer of these policies, they reached a special telephone line within MBC which was answered "law office" by MBC employees, to make it appear that the transaction was being handled by **LIVOTI'S** law firm as part of the "gift" that he was receiving.

### Acquisition of Other Problematic Policies

28.     **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER, MICHAEL McNERNEY, ANTHONY LIVOTI, JR.,** their co-conspirators, and others, purchased group and other policies for MBC's investment program which frequently had premium payments that increased significantly over time. This condition was made worse by the fact that the insureds on most MBC policies lived well beyond the fraudulently predicted life expectancies.

29.     Despite representations to investors to the contrary, the defendants and their co-conspirators failed to reserve sufficient funds to make payments on these increasing premium policies.

30.     MBC also sold investments that had policies with "shrinking face values," or decreasing death benefits over time. The defendants failed to disclose and concealed the fact that MBC investors who were placed on these policies faced the increased risk that death benefit ultimately paid by the insurance company could be less than the amount they invested.

### Resale of Old Failed Policies to New Investors

31.     Given the fact that most MBC's policies never matured, a large number of investors became dissatisfied with their investment in MBC's viatical and life settlement program. In some instances, the dissatisfied investors filed formal complaints with state regulators and others filed

lawsuits against MBC. In connection with some of these lawsuits and regulatory actions, MBC was forced to refund the failed investments.

32.     To enable MBC to resell these failed investments, **MICHAEL McNERNEY,** and others working at his direction at The Firm, prepared documents that released the investor's interest in the failed policy back to MBC. Investors were required to sign the releases to get their refund. Once the dissatisfied investor released his interest in the failed policy, **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER, MICHAEL McNERNEY**, their co-conspirators, and others, resold that old investor's interest in the failed policy to a new investor. The defendants, their co-conspirators, and others, used the new investor's money to pay the cost of the refund.

33.     **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER, MICHAEL McNERNEY**, their co-conspirators, and others, concealed from investors the fact that MBC used new investors' money to pay refunds to dissatisfied investors. The defendants, their co-conspirators, and others, further concealed that some investors were assigned to policies that had already exceeded one MBC life expectancy, and that the new life expectancy assigned to the policy could be based on old, outdated medical information. On these policies, the defendants, their co-conspirators, and others, failed to set aside any additional money to pay future premiums on the failed policy during the newly assigned life expectancy.

34.     Despite that fact that **JOEL STEINGER,** Conspirator L.S., **STEVEN STEINER**, **MICHAEL McNERNEY**, their co-conspirators, and others, regularly claimed that MBC ceased selling interests in AIDS -related policies in or around 2001, many of the refunded policies that were resold to new investors between 2001 and May 2004 were AIDS-related policies.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-8
### (Mail Fraud: 18 U.S.C. §§ 1341 and 2)

1.     Paragraphs 1 through 30 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around October 1994, to in or around May 2004, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL STEINGER,**
**a/k/a "Joel Steiner,"**
**STEVEN STEINER,**
**a/k/a "Steven Steinger,"**
**MICHAEL McNERNEY,**
**and**
**ANTHONY LIVOTI, JR.,**

knowingly and with intent to defraud did devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and attempting to do so, did knowingly cause to be delivered certain mail matter by the United States Postal Service and a private and commercial interstate carrier, according to the directions thereon.

## PURPOSE OF THE SCHEME AND ARTIFICE

3.     A purpose of the scheme and artifice was for the defendants and their accomplices to unjustly enrich themselves by misappropriating monies from investors for their personal use and benefit by means of materially false and fraudulent representations and concealment of material facts concerning, among other things, the safety and security of MBC investments and the expected profits of these investments.

22

## THE SCHEME AND ARTIFICE

4.     Paragraphs 4 through 34 of the Manner and Means section of Count 1 of this Indictment are re-alleged and incorporated by reference herein as a description of the scheme and artifice.

## USE OF THE MAILS

5.     On or about the dates specified as to each count, the defendants, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, did knowingly cause to be delivered by the United States Postal Service and a private and commercial interstate carrier, according to the directions thereon, the items identified below in each count:

| COUNT | APPROX. DATE | DESCRIPTION OF MAILING |
|-------|-------------|------------------------|
| 2 | December 23, 2003 | Refund letter from The Firm and MBC refund check sent via Federal Express from within the Southern District of Florida to investor R.E. and investor B.E. in Princeville, Hawaii |
| 3 | December 30,  2003 | Welcome letter from MBC mailed from within the Southern District of Florida to investor F.W. in Plantation, Florida |
| 4 | January 28, 2004 | Revised beneficiary designation letter from MBC mailed from within the Southern District of Florida to investor D.O. in Sarasota, Florida |
| 5 | March 4, 2004 | Status update letter from MBC mailed from within the Southern District of Florida to investor R.M. in Deerfield Beach, Florida |

23

| COUNT | APPROX. DATE | DESCRIPTION OF MAILING |
|-------|--------------|------------------------|
| 6 | March 8, 2004 | Policy identification letter from MBC mailed from within the Southern District of Florida to investor A.H. and investor B.H. in Coral Springs, Florida |
| 7 | April 26, 2004 | Absolute assignment of ownership letter from MBC mailed from within the Southern District of Florida to investor A.H. and investor B.H. in Coral Springs, Florida |
| 8 | May 4, 2004 | Welcome letter from MBC mailed from within the Southern District of Florida to investor S.S. in Miami Beach, Florida |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 9-24
### (Wire Fraud: 18 U.S.C. §§ 1343 and 2)

1.      Paragraphs 1 through 30 of the General Allegations section of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      From in or around October 1994, to in or around May 2004, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL STEINGER,**
**a/k/a "Joel Steiner,"**
**STEVEN STEINER,**
**a/k/a "Steven Steinger,"**
**MICHAEL McNERNEY,**
**and**
**ANTHONY LIVOTI, JR.,**

did knowingly and with intent to defraud devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, knowing that the pretenses, representations and promises were false and fraudulent when made.

24

## PURPOSE OF THE SCHEME AND ARTIFICE

3.      The purpose of the scheme and artifice was for the defendants and their accomplices to unjustly enrich themselves by misappropriating monies from investors for their personal use and benefit by means of materially false and fraudulent representations and concealment of material facts concerning, among other things, the safety and security of MBC investments and the expected profits of these investments.

## THE SCHEME AND ARTIFICE

4.      Paragraphs 4 through 34 of the Manner and Means section of Count 1 of this Indictment are realleged and incorporated herein by reference as a description of the scheme and artifice.

## USE OF THE WIRES

5.      On or about the dates specified as to each count below, the defendants, for the purpose of executing the aforesaid scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, certain writings, signs, and signals, as more particularly described in each count below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|--------------|-----------------------------------|
| 9 | February 2, 2004 | Wire transfer of investor retirement funds in the amount of $221,106.00 from a Bank of New York account outside of the State of Florida to MBC Purchase Escrow Account #XXXXXX1073 in the Southern District of Florida |

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|--------------|-----------------------------------|
| 10 | February 9, 2004 | Wire transfer of investor retirement funds in the amount of $303,977.00 from a Bank of New York account outside of the State of Florida to MBC Purchase Escrow Account #XXXXXX1073 in the Southern District of Florida |
| 11 | February 13, 2004 | Wire transfer of investor retirement funds in the amount of $17,216.00 from a Bank of New York account outside of the State of Florida to MBC Purchase Escrow Account #XXXXXX1073 in the Southern District of Florida |
| 12 | February 18, 2004 | Wire transfer of investor retirement funds in the amount of $81,898.00 from a Bank of New York account outside of the State of Florida to MBC Purchase Escrow Account #XXXXXX1073 in the Southern District of Florida |
| 13 | February 23, 2004 | Wire transfer of investor retirement funds in the amount of $19,983.00 from a Bank of New York account outside of the State of Florida to MBC Purchase Escrow Account #XXXXXX1073 in the Southern District of Florida |
| 14 | February 27, 2004 | Wire transfer of investor retirement funds in the amount of $754,648.00 from a Bank of New York account outside of the State of Florida to MBC Purchase Escrow Account #XXXXXX1073 in the Southern District of Florida |
| 15 | March 12, 2004 | Electronic payment instructions sent from the MBC operating account in the Southern District of Florida to the SWIFT message facility in Virginia to effect the transfer of $32,441.50 to Wachovia account #XXXXX0021 for the benefit of an MBC marketing director |
| 16 | March 17, 2004 | Wire transfer in the amount of $1,564,827.00 related to the purchase and sale of an insurance policy insuring J.S. from a Union Planters account outside of the State of Florida to the MBC operating account in the Southern District of Florida |

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|--------------|-----------------------------------|
| 17 | March 18, 2004 | Wire transfer in the amount of $151,632.00 related to the purchase and sale of an insurance policy insuring J.S. from a Union Planters account outside of the State of Florida to the MBC operating account in the Southern District of Florida |
| 18 | March 19, 2004 | Electronic payment instructions sent from the MBC operating account in the Southern District of Florida to the SWIFT message facility in Virginia to effect the transfer of $53,161.27 to Wachovia account #XXXXX0021 for the benefit of an MBC marketing director |
| 19 | March 24, 2004 | Wire transfer in the amount of $818,640.00 related to the purchase and sale of an insurance policy insuring J.S. from a Union Planters account outside of the State of Florida to the MBC operating account in the Southern District of Florida |
| 20 | April 20, 2004 | Electronic payment instructions sent from the MBC operating account in the Southern District of Florida to the SWIFT message facility in Virginia to effect the transfer of $41,616.00 to Wachovia account #XXXXXXXX2233 for the benefit of a company that sold MBC investments |
| 21 | May 3, 2004 | Electronic payment instructions sent from the MBC operating account in the Southern District of Florida to the SWIFT message facility in Virginia to effect the transfer of $1,000,000.00 to Northern Trust account #XXXXXX3417 for the benefit of defendant **STEVEN STEINER** |
| 22 | May 3, 2004 | Electronic payment instructions sent from the MBC operating account in the Southern District of Florida to the SWIFT message facility in Virginia to effect the transfer of $1,000,000.00 to Wachovia account #XXXXXX0230 for the benefit of Conspirator L.S. |
| 23 | May 3, 2004 | Wire transfer from the MBC operating account in the Southern District of Florida in the amount of $1,000,000.00 to Stearns Bank account #XXXXX0455 in Minnesota for the benefit of defendant **JOEL STEINGER** |

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|-------|--------------|-----------------------------------|
| 24 | May 3, 2004 | Electronic payment instructions sent from the MBC operating account in the Southern District of Florida to the SWIFT message facility in Virginia to effect the transfer of $1,000,000.00 to Wachovia account #XXXXXXXXX7654 for the benefit of Peter Lombardi |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 25
### Conspiracy to Commit Money Laundering
### (18 U.S.C. § 1956(h))

1.    From in or around October 1994 through in or around May 2004, in the Southern District of Florida, and elsewhere, the defendants,

**JOEL STEINGER,**
**a/k/a "Joel Steiner,"**
**STEVEN STEINER,**
**a/k/a "Steven Steinger,"**
**MICHAEL McNERNEY,**
**and**
**ANTHONY LIVOTI, JR.,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with each other to commit certain offenses against the United States, that is,

a.    to engage in monetary transactions affecting interstate commerce, such transactions involving criminally derived property of a value greater that $10,000 and such property having been derived from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957;

b.    to conduct financial transactions affecting interstate and foreign commerce, which

28

transactions involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and with the intent to promote the carrying on of such specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i);

      c.      to conduct financial transactions involving the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, and knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of a specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

It is further alleged that the specified unlawful activities are mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343.

All in violation of Title 18, United States Code, Section 1956(h).

## CRIMINAL FORFEITURE

1.      Pursuant to Title 28, United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21, United States Code, Section 853, upon conviction of the violations alleged in Counts 1-24 of this indictment, the defendants **JOEL STEINGER**, and **STEVEN STEINER** shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2.      Pursuant to Title 18, United States Code, Section 982 and Title 21, United States Code, Section 853, upon conviction of the violations alleged in Count 25, defendants **JOEL STEINGER**, and **STEVEN STEINER** shall forfeit to the United States any property, real or personal, involved in the aforestated offense(s) or any property traceable to such property. The

29

property subject to forfeiture includes, but is not limited to, the following:

      a.    All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 501 Riviera Isle, Fort Lauderdale, Florida 33301, and more particularly described as:

Lot 38, in Block 2, of RIVIERA, according to the Plat thereof, recorded in Plat Book 6, Page 17, of the Public Records of Broward County, Florida;

Together with a parcel of "land" in or on the Rio Placid (Canal) lying West of and adjacent to Lot 38, Block 2, of RIVIERA, according to the Plat thereof, as recorded in Plat Book 6, Page 17, of the Public Records of Broward County, Florida, as described as follows:

Beginning at the Northwest corner of said Lot 38, thence running Southwesterly, Southerly and Southeasterly, along the arc of a non-tangential curve, (concave to the East, having a radius of 27 feet, a central angle of 147 degrees, 47 minutes and 03 seconds) for an arc distance of 69.64 feet, to the West line of said Lot 38, thence Northerly along the West Line of said Lot 38, for a distance of 51.88 feet to the point of beginning.

Pursuant to Title 18, United States Code, Section 982(a)(1).

      3.    If the property described above as being subject to forfeiture, as a result of any act or omission of the defendants **JOEL STEINGER**, and **STEVEN STEINER**,

      (1)    cannot be located upon the exercise of due diligence;

      (2)    has been transferred or sold to, or deposited with a third person;

      (3)    has been placed beyond the jurisdiction of the Court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be subdivided without difficulty;

4.     It is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

All pursuant to Title 28, United States Code, Section 2461, Title 18, United States Code, Section 981(a)(1)(C), and Title 21, United States Code, Section 853.

A TRUE BILL

/ FOREPERSON

ERIC I. BUSTILLO
ACTING UNITED STATES ATTORNEY

ANDREW K. LEVI
ASSISTANT UNITED STATES ATTORNEY

RYAN DWIGHT O'QUINN
ASSISTANT UNITED STATES ATTORNEY

31

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

vs.

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

JOEL STEINGER,
a/k/a JOEL STEINER, et al.,
                    **Defendants.**
_____/

**Superseding Case Information:**

**Court Division:** (Select One)

| | | | |
|---|---|---|---|
| __X__ | Miami _____ | Key West _____ | |
| _____ | FTL _____ | WPB _____ | FTP |

New Defendant(s)          Yes _____   No _____
Number of New Defendants          _____
Total number of counts          _____

I do hereby certify that:

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:     (Yes or No)          __No__
    List language and/or dialect     _____

4.  This case will take     __120__   days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

    (Check only one)

| | | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | | Petty | _____ |
| II | 6 to 10 days | _____ | | Minor | _____ |
| III | 11 to 20 days | _____ | | Misdem. | _____ |
| IV | 21 to 60 days | _____ | | Felony | __X__ |
| V | 61 days and over | __X__ | | | |

6.  Has this case been previously filed in this District Court? (Yes or No)     __No__
    If yes:
    Judge: _____     Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?     (Yes or No)     __No__
    If yes:
    Magistrate Case No. _____
    Related Miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____
    Defendant(s) in state custody as of _____
    Rule 20 from the _____     District of _____

    Is this a potential death penalty case? (Yes or No)     __No__

7.  Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?     _____ Yes   __X__ No

8.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?     _____ Yes   __X__ No

_____
ANDREW K. LEVI
ASSISTANT UNITED STATES ATTORNEY
Florida Bar # 0048774

*Penalty Sheet(s) attached

REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** **JOEL STEINGER, a/k/a "Joel Steiner"**

**Case No:**

Count #:  1

Conspiracy to Commit Mail/Wire Fraud

Title 18, United States Code, Section 1349

**\* Max.Penalty:** 20 Years' Imprisonment

Count #: 2-8

Mail Fraud

Title 18, United States Code, Section 1341

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 9-24

Wire Fraud

Title 18, United States Code, Section 1343

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 25

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**   **STEVEN STEINER, a/k/a "Steven Steinger"**

**Case No:**

Count  #:  1

Conspiracy to Commit Mail/Wire Fraud

Title 18, United States Code, Section 1349

**\* Max.Penalty**: 20 Years' Imprisonment

Count  #: 2-8

Mail Fraud

Title 18, United States Code, Section 1341

**\*Max. Penalty:** 20 Years' Imprisonment

Count  #: 9-24

Wire Fraud

Title 18, United States Code, Section 1343

**\*Max. Penalty:** 20 Years' Imprisonment

Count  #: 25

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**  **MICHAEL McNERNEY**

**Case No:**

Count #:  1

Conspiracy to Commit Mail/Wire Fraud

Title 18, United States Code, Section 1349

**\* Max.Penalty**: 20 Years' Imprisonment

Count #: 2-8

Mail Fraud

Title 18, United States Code, Section 1341

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 9-24

Wire Fraud

Title 18, United States Code, Section 1343

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 25

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:  ANTHONY LIVOTI, JR.**

**Case No:**

Count #:  1

Conspiracy to Commit Mail/Wire Fraud

Title 18, United States Code, Section 1349

**\* Max.Penalty**: 20 Years' Imprisonment

Count #: 2-8

Mail Fraud

Title 18, United States Code, Section 1341

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 9-24

Wire Fraud

Title 18, United States Code, Section 1343

**\*Max. Penalty:** 20 Years' Imprisonment

Count #: 25

Conspiracy to Commit Money Laundering

Title 18, United States Code, Section 1956(h)

**\*Max. Penalty:** 20 Years' Imprisonment

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**